CHAMBERLAIN (EMIGH v.). See Case No. 4,447.

CHAMBERLAIN (GLADSTONE v.). See Cases Nos. 5,469–5,471.

CHAMBERLAIN (LYMAN VENTILATING & REFRIGERATOR CO. v.). See Case No. 8,631.

CHAMBERLAIN v. The McDONALD. See Case No. 11,238.

## Case No. 2,578.

### CHAMBERLAIN v. ST. PAUL & S. C. R. CO. et al.

[1 Cent. Law J. 53.] [1]

Circuit Court, D. Minnesota. Dec. Term, 1873.[2]

LAND GRANT TO RAILROADS — MINNESOTA STATE RAILROAD BONDS—CONSTITUTIONAL AMENDMENT —REMEDIES.

1. The present railroad companies, to which the land grant of congress was re-granted on the failure of the old companies (upon which the benefit of the grant was first conferred) to build the roads, do not hold any of the said lands, not even the first 120 sections, subject to any trust in favor of the creditors of the state, or of the former companies.
[See note at end of case.]

2. Power of the state over the disposition of the railroad aid land grant considered.

3. Minnesota state railroad aid bonds, issued under the amendment to the state constitution of April 15, 1858, held valid.

4. Construction of said constitutional amendment and the nature of the remedies by foreclosure and forfeiture considered.

On the 3d day of March, 1857, congress granted to the territory of Minnesota, lands to aid in the construction of certain lines of railroads therein. 11 Stat. 195. By the act it is provided, inter alia, that "the lands hereby granted for and on account of said road and branches severally, shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses; and the same shall be applied to no other purpose whatever." Section 4 enacts: "That the land hereby granted * * * shall be disposed of by said state only in the manner following: that is to say, that a quantity of land not exceeding one hundred and twenty sections for each of said roads and branches, * * * may be sold; and when the governor shall

[1] [Reprinted by permission.]
[2] [Affirmed in Chamberlain v. St. Paul & S. C. R. Co., 92 U. S. 299.]

certify * * * that any twenty continuous miles of any of said roads, etc., is completed, then another quantity of land not to exceed one hundred and twenty sections, * * * for each of said roads * * * may be sold," and so on. The territorial legislature of Minnesota, passed an act, approved May 22, 1857, entitled "An act to execute the trust created by an act of congress, entitled 'An act,' etc.;" and by chapter 3 of said act, the Root River Valley & Southern Minnesota R. R. Co., a corporation created and then existing under the laws of said territory (the name of which corporation was soon after changed to the "Southern Minnesota R. R. Co."), was authorized to construct two of the lines of said road mentioned in the said act of congress, being the lines since severally constructed by the two companies, defendants in this action. That, by sections 3, 7 and 12, of said chapter 3, of said territorial act, it was provided that said railroad company, upon the construction of said lines of road, as in said act and the act of congress provided, should have the lands to aid in the construction thereof, in and by said act of congress designated.

On the 15th day of April, 1868, an amendment to the constitution of the state was adopted by the people, authorizing the issue of state bonds, not to exceed $5,000,000, to the land grant railroads, "for the purpose of expediting the construction thereof." By this amendment the provision was, that state bonds to the amount of $100,000 should be issued to each company for every ten miles of road made "ready for placing the superstructure thereon," and $100,000 for each ten miles completed with cars running thereon. "Said bonds thus issued shall be denominated 'Minnesota state railroad bonds,' and the faith and credit of the state are hereby pledged for the payment of the interest and the redemption of the principal thereof." By this amendment, also, the state bonds were to be made payable to the order of the company to which they were issued, and transferable by the endorsement of the president thereof. Then follows this provision: "Each company shall make provision for the punctual payment and redemption of all bonds issued and delivered to it, and for the punctual payment of the interest which shall accrue thereon, in such manner as to exonerate the treasury of this state from any advances of money for that purpose; and as security therefor, the governor shall demand and receive from each of said companies, before any of such bonds are issued, an instrument pledging the net profits of the road for the payment of said interest, and a conveyance to the state of the first 240 sections of land, free from prior incumbrances, which said company is or may be authorized to sell in trust for the better security of the treasury of the state from loss on said bonds," etc. And by the said constitutional amendment it was also provided that as a further security, each company should transfer to the state its own first mortgage bonds, corresponding in amount to the said state bonds so issued to such company; and in case of default of such company to pay the interest on the state bonds so issued to it, the governor was authorized, in such manner as should be provided by law, to sell the said first mortgage bonds of such company so transferred to the state, or require a foreclosure of the mortgage executed by said company to secure the same. And it was further provided, that in consideration of the loan of the state credit to such companies, and as a condition thereof, each company should complete not less than fifty miles of its road on or before the 31st of December, 1861, and not less than 100 miles before the year 1864, and four-fifths of the entire line before the year 1866; and any failure so to complete within the said several times, should forfeit to the state all the right, title and interest of any kind whatsoever, in and to any lands together with the franchises connected with the same pertaining to the portion of the road so uncompleted. Said proposed amendment was submitted to the people, for approval, at a special election, held April 15, 1858, and was approved by a vote of about five to one. But said proposed amendment was not submitted to congress, or referred to in the act admitting Minnesota as a state. The said Root River Valley & Southern Minnesota R. R. Co. accepted the provisions of said amendment.

In October, 1858, the Southern Minnesota R. R. Co. (being the new name for the Root River Valley & Southern Minnesota R. R. Co.) executed to the state an instrument, pledging the net profits of the road for the payment of the interest on the state bonds that should be issued to it, and also a conveyance of the first 240 sections of land which it was or might be authorized to sell, for the better security of the state against the payment of interest on the state bonds so to be issued to the said company. And, on October 1, 1868, the company made a trust deed to Pringle & Chatfield, trustees, on the road, lands, franchises, and property of every description, to secure $2,000,000 of the bonds of the company. In July, 1857, the route of the Southern Minnesota R. R. Co. was located. In 1858, and early in 1859, the plaintiff constructed roadbed and received therefor from the companies, state bonds endorsed by the companies, to the amount of $575,000. In 1859, the railroad company became insolvent and never completed a mile of road, nor did anything beyond the grading, and made default in the payment of interest on its bonds and on the bonds of the state.

In 1860, the constitution was amended by "expunging" the amendment of April 15, 1858, under which the state bonds were issued, "saving to the state all rights, reme-

dies and forfeitures accruing under said amendment;" and by providing that "no law levying a tax or making other provision for the payment of interest or principal of the bonds denominated 'Minnesota state railroad bonds' shall take effect, or be in force, until such law shall have been submitted to a vote of the people of the state, and adopted by a majority of the electors of the state voting upon the same." By an act of the legislature of the state, of August 12, 1858, and March 6, 1860, provision was made for the foreclosure of the mortgages, by order of the governor, of such companies as should be in default in payment of the interest on the state bonds that should be issued to it, and also in default in the payment of the interest of its own bonds, which should be held by the state as indemnity, as provided in said loan amendment, and upon such foreclosure to bid the property in, in the name and for the use of the state.

The original Southern Minnesota R. R. Co. having made default in payment of interest both on its own bonds and the bonds of the state, the governor duly caused the deed of trust to the state to be foreclosed and all lands, etc., were sold to and purchased for and in the name of the state, and a conveyance made to the state therefor, and the state continued to hold all the lands, property and franchises. thus acquired, until the 4th day of March, 1864. On March 4, 1864, the legislature of the state passed an act, whereby the present railroad companies, defendants in this action, were created, and all rights acquired by the state by virtue of said foreclosure proceedings, or by any forfeiture to the state, done or suffered by said old or original Southern Minnesota R. R. Co., were granted to the new companies thereby created, free and clear of all liens whatsoever, with further provisions that said new companies should have and receive severally, the lands pertaining to the line of the road which each was empowered to construct, upon the construction and completion of the same as provided in said act, and in said act of congress. The said railroad companies, defendants, severally went on under said act and completed their several lines of road, and received therefor, as the same were constructed, the lands from the state appertaining thereto under said congressional grant; said congressional grant having been amended so as to allow the lands to be disposed of by the state, as the lines were constructed in sections of ten instead of twenty miles, as originally provided. The said defendants, the railroad companies, to raise the means to construct said lines of road, issued their bonds severally, and mortgaged their roads, franchises and lands, to secure said bonds, as set forth in the answers of the trustees in this action. That said defendants acquired no title, right or license, in regard to the right of way

from, through or under the old company, but procured the right of way from the individual land owners, over and upon which the old grading was done, so far as they used the same.

The present bill is by the plaintiff [Selah Chamberlain], as the holder of $500,000 state bonds, and is brought, not against the railroad companies to which they were issued, and which endorsed them, but against the new companies created in 1864, and to which the state re-granted the lands and property, and against the trustees in mortgages executed by the present companies to secure bonds issued to borrow money to build the roads, and as to the lands (particularly the first 240 sections granted to the said roads) and franchises conferred upon the present companies by the legislature of 1864, seeks to charge them with a trust for the payment of the plaintiff's bonds. The bill, in substance, prays for discovery and answer to special interrogatories; for a receiver; for an account of value of franchises and road beds at time of conveyance to defendants; for the value of all lands sold for cash; that defendants pay over all moneys by them received, and deliver all bonds, mortgages, contracts or evidences of indebtedness, for sale of lands to the receiver; convey to him all the lands remaining unsold; all to be by him converted into cash and applied to the liquidation of said state bonds and interest; and for general relief.

Gordon E. Cole and F. R. E. Cornell, for complainant.

Gilman, Clough & Wilder, E. C. Palmer, Gilfillan & Williams, and H. F. Horn, for defendants.

DILLON, Circuit Judge. The plaintiff, who was a contractor on certain railroads, to which the state originally gave the benefit of the land grant of congress, holds bonds of the state of Minnesota, issued pursuant to the constitutional amendment of April 15, 1858, to the amount of half a million of dollars, upon which no interest has been paid since 1859, and which, by the expunging amendment to the constitution of 1860, if valid, the state legislature is disabled from paying or making provision to pay, until a law for that purpose shall be approved by a popular vote. These bonds were endorsed by the original companies to which they were issued, and which, as between them and the state, are the principal and primary debtors. The present defendants, the St. Paul & Sioux City R. R. Co., and the Southern Minnesota R. R. Co., are not the companies with which the plaintiff contracted and for which he did work, but are companies created by the state in 1864, and to which the state then re-granted the lands and property, which it had obtained by foreclosure or forfeiture, or both, from the old

or original companies. The bill proceeds up, on the theory that the plaintiff's bonds are legal and subsisting obligations of the state; that the companies to which they were issued are the principal debtors, and the state their surety; that the lands, particularly the first 120 sections to each road, became by the act of the legislature of May 22, 1857, the property of the companies; that the only interest the state afterwards acquired in these lands, was the right to hold them to secure itself against loss by reason of its issue of state bonds; that the plaintiff, a creditor of the main debtor, has a right in equity to be subrogated to the rights of his surety (the state) in respect to all securities belonging to the principal debtor, and that the present companies not being bona fide purchasers of the lands for value and without notice, are open to the same trusts which might have been fastened upon them had they still remained in the hands of the state. That the bonds held by the plaintiff are the legal obligations of the state, and binding upon it in law, honor and justice, I have no doubt. Indeed, counsel have not seriously contended that these bonds were not valid. They were issued pursuant to an amendment of the constitution of the state, adopted by a popular vote of about 35,000 for, to 8,000 against the project; and have been repeatedly recognized as valid by subsequent legislation of the state, and by the foreclosure proceedings. Under these circumstances, the fact that it does not appear that the acting governor signed the bill, providing for the submission to the people of the loan amendment to the constitution, is a matter of no consequence. In the amendment to the constitution "the faith and credit of the state are pledged for the payment of the interest and the redemption of the principal" of the bonds; they are signed by the governor and bear upon their face the seal of the state; they were issued to the plaintiff and others for grading and work actually done upon the roads at the rate specified in the constitutional amendment, and the state obtained the benefit of the securities it took for its indemnification, and re-granted the property it acquired, free from all liens, to the present companies; under these circumstances, if the state were suable in the courts, there can be no doubt that the bonds would be legally enforceable against it. Justice and honor alike, require the state to recognize these bonds as binding upon it, and in the end the court cannot doubt that the people of the state will so ordain. A state with such a future before it as the state of Minnesota, cannot afford to bear the odium of repudiation, and if there are no other difficulties in the plaintiff's way, except the suggested one that his bonds are invalid, he will be entitled to the relief demanded.

The main purpose of the bill is to charge the first 120 sections of land granted by the state to the original companies, and by the act of 1864 re-granted to the present companies, with an equitable trust in favor of the plaintiff, for the payment of his state bonds endorsed by the old companies. It is admitted that the old companies, after doing a large amount of grading, became insolvent, and that they never completed any part of their line of road, and hence under the act of congress never became entitled to any lands, unless it may be the first 120 sections to each of the roads. These, the plaintiff contends, the state, under the act of congress of March 3, 1857, making the grant, had a right to sell in advance of construction; that the act of the territorial legislature of May 22, 1857, was a sale of the 120 sections to the companies, by force, whereof, they became absolutely their property by a title not subject to be divested by their subsequent failure to build the roads; that being the property of the companies they had a right to pledge them to the state to indemnify it against liabilities it assumed for them; and that the plaintiff has the right to follow these lands into the hands of the state or its grantees, with notice, and subject them to payment of his bonds. The lands granted to the state by congress were held by it in trust to be "exclusively applied to the construction of the road for and on account of which such lands were granted, and the same should be applied to no other purposes whatsoever." Said lands "shall be disposed of," says the act of congress, "by the state only, in the manner following, that is to say, that a quantity of land not exceeding 120 sections for each of said roads and branches * * * may be sold; and when the governor shall certify that any twenty continuous miles of any said roads, etc., is completed, then a quantity not exceeding 120 sections * * * for each of said roads, may be sold," and so on. This comprised the extent of the power of the state over these lands. The state was a trustee whose powers were strictly limited by the congressional enactment. The state might, I am inclined to think, have sold the 120 sections in advance of construction, and conveyed a good title; but I doubt whether the act of the legislature of May 22, 1857, was a sale to the original companies so as to confer a title not subject to be defeated, if they failed to construct the roads as required by the act of congress; and I am clear, that under the act of congress it was not competent for the state, acting as a trustee, to acquire any lien on or right in these lands, inconsistent with the unfettered execution of its trust duties under the act of congress. The state sustained to the old companies a double relation, one as trustee under the land grant act of congress; the other as the sovereign which had created these companies, and was undertaking to aid them in their enterprise by a loan of its own credit. Now it is clear

that if the state became a creditor of these companies, it could not lawfully stipulate for security out of lands which it held in trust, if this would be inconsistent with its duties under the act of congress.

In this view, I have serious doubts as to the validity of the security for its bonds which the state sought to obtain by the constitutional amendment upon the lands or any of them, which had been granted by congress, and which had never been earned by the completion of the required section of 20 (subsequently reduced to 10) miles of road. But I need not decide the point; for assuming that the 120 sections became the absolute property of the company, it was then competent for the state to take security, upon it for its indemnity, and to provide for the forfeiture thereof to the state in case the roads were not completed as required by the constitutional amendment. The companies made default in the payment of interest, and their rights were foreclosed, and the property purchased by the state. · The companies failed to build and complete the roads, as required by the constitutional amendment; and the legislation of 1864 shows that the state elected to take advantage of the forfeiture. Foreclosure and forfeiture were cumulative and concurrent remedies. The main object of the mortgage was pecuniary indemnity to the state. The principal purpose of the provisions for forfeiture was to secure the completion of the roads by the stipulated time. By foreclosure or forfeiture, or both, the rights of the old companies in those lands became vested in the state. It need not be denied in this case, that if these bonds were still in the hands of the state, or a voluntary grantee or a purchaser with notice, that the plaintiff, as the holder of unpaid state bonds (to indemnify the state against which the companies had conveyed to it the lands) might fasten an equitable trust upon them. Undoubtedly, he could do this, if these lands were in the hands of the state, discharged of any trusts under the act of congress. But upon the failure of the old companies, the state, in 1864, in order to secure the completion of the roads, created the present companies, and granted to them all the lands and franchises which had been granted to the old companies, "free of all claims or liens," and on the faith of this legislation, the new companies have built, completed the lines of road, the one at a cost of $5,000,000 and the other at a cost of $3,000,000. The money to accomplish this was raised upon deeds of trust and mortgages yet outstanding, made by the present companies to secure issues of bonds, preferred stock and land certificates. After all this is done, the present bill is filed, and it would, in my judgment, be inequitable as against the present companies and their creditors, to hold that the plaintiff could subject to the payment of his bonds the land or other property which the defendant compa-

nies acquired from the state by the legislation of 1864.

A decree will, therefore, be entered, dismissing the bill with costs. Decree accordingly.

NOTE [from original report]. Construction of acts of congress granting public lands to states to aid in building railroads: Schulenburg v. Harriman [Case No. 12,486]; Rice v. Minnesota & N. W. R. Co., 1 Black [66 U. S.] 358; State v. Southern Minn. R. Co., 18 Minn. 50 [Gil. 21]. To Union Pacific Railroad Co.: Union Pac. R. Co. v. Watts [Case No. 14.385]. Taxation of such lands by the states: Kansas Pac. R. Co. v. Prescott, 16 Wall. [83 U. S.] 603. Lien of state to secure state bonds issued to the companies: Murdock v. Woodson [Case No. 9,942]; Wilson v. Boyce [Id. 17,793].

[NOTE. The plaintiff appealed to the supreme court, which affirmed the decree herein. Chamberlain v. St. Paul & S. C. R. Co., 92 U. S. 299. Mr. Justice Field, in delivering the opinion, held that the act of congress of March 3, 1857, only authorized for each road, in advance of its construction, a sale of 120 sections, and that no further disposition of land along the road was allowable, except as the road was completed in divisions of 20 miles, and, furthermore, that, as to the land conveyed to indemnify the state against losses on the bonds, the bondholders had no equity to have the land applied to the payment of the bonds which could be enforced against the state, and that the grantees from the state took the property discharged of all claims of the bondholders.]